IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JOHN R. LUCAS, et al.,

            Plaintiffs,

v.                                    CIVIL ACTION NO. 2:15-cv-13534

ICG BECKLEY, LLC, et al.,

            Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants ICG Beckley, LLC ("ICG Beckley") and Arch Coal, Inc.'s ("Arch Coal") unopposed Motion for Summary Judgment.[1] (ECF No. 41.) For the reasons below, the Court **GRANTS** the motion.

*I. BACKGROUND*

This case arises out of an injury Plaintiff John Lucas ("Lucas") suffered on May 5, 2013, while rock dusting an approximately half-mile portion of slope inside the Beckley Pocahontas Mine in Raleigh County, West Virginia. (ECF No. 1-1 at 7–8 ¶¶ 8, 10, 15–16.) ICG Beckley, a subsidiary of Arch Coal, operated that mine. (*Id.* at 6 ¶ 2.) Lucas was working with two co-workers to rock dust the slope "by means of a rock duster . . . attached to the end of a lowboy, which lowboy was attached to a hoist car." (*Id.* at 8 ¶ 11.) According to the Complaint, the

---

[1] Also pending are five motions in limine filed by Defendants to exclude various evidence at trial. (ECF Nos. 40, 43, 44, 45, 46.) Because the current Memorandum Opinion and Order disposes of this case, alleviating the need for trial, the Court **DENIES AS MOOT** those motions.

1

lowboy held eight pallets loaded with forty- to eighty-pound bags of rock dust. (*Id.* ¶ 12.) The three workers sat inside the hoist car while the rock dust was applied, and when the rock duster emptied, the workers exited the hoist car to refill the rock duster tank with the bags of rock dust located on the pallets. (*Id.* ¶¶ 13–14.) To refill the rock duster, Lucas "remove[d] bags of rock dust and carr[ied] them at an 18-percent slope" to the two other workers who dumped the bags' contents into the rock duster. (*Id.* ¶ 14.) They repeated this process until the rock duster was refilled. (*Id.*)

At some time during the day, the rock duster needed refilled. The co-worker operating the hoist car stopped it so the employees could exit the car. (*Id.* ¶ 15.) Lucas went down to the lowboy "to retrieve 50-pound bags of rock dust at which time the brake failed, causing the hoist car and lowboy to free fall approximately 20-25 feet before coming to a stop." (*Id.*) The parties dispute whether the car(s) actually moved at this time. (*See* ECF No. 42 at 4 (citations omitted).) Four pallets, holding a total of approximately seventy forty- to eighty-pound bags of rock dust, allegedly struck Lucas, causing him to fall against the rock duster and his leg to be pinned against it. (ECF No. 1-1 at 8–9 ¶ 16.) Lucas' co-workers freed him, but as a result of the hoist car brake's failure, Lucas allegedly suffered leg and back injuries. (*Id.* at 9 ¶¶ 17–18; 12 ¶ 38(e).) Defendants, however, assert that Lucas only suffered injury to one of his legs from this incident.[2] (*See* ECF No. 42 at 4–5.)

Two ICG Beckley employees interviewed Lucas for an internal accident report, and

---

[2] Defendants state in their motion's supporting memorandum of law that after leaving ICG Beckley and beginning work with Alpha Natural Resources, Lucas subsequently injured his back picking up a heavy beltine roller. (*See* ECF No. 42 at 7.) They further claim that Lucas received workers' compensation for the injury but "decided to restyle his back injury as an exacerbation of his leg injury at ICG Beckley some eighteen months earlier" amid displeasure with the amount he received through the workers' compensation claim. (*See id.*)

according to the Complaint Lucas drove himself to Raleigh General Hospital after one of those other employees allegedly cancelled the summoned ambulance. (ECF No. 1-1 at 9 ¶¶ 17–22. *But see* ECF No. 41-1 at 31 (Griswold Dep.) (noting that an ambulance was never called in the first place).) Upon receiving a medical examination by an emergency room physician, Lucas was discharged from the hospital and returned to work the next day on light-duty before resuming regular duty the day after. (ECF No. 1-1 at 9 ¶¶ 29–31.) Within approximately two weeks of his return, ICG Beckley employee Keith Goins allegedly threatened Lucas with termination if he and his co-workers did not sign a document presented to them indicating that they were at fault for the incident. (*Id.* at 11 ¶ 32.) Finally, Lucas alleges that ICG Beckley's employees did not complete an accident or occupational injury report nor did the company submit either of the same to the proper regulatory authorities regarding the incident and Lucas' injuries. (*Id.* ¶ 33.) Lucas continued to work for ICG Beckley for approximately one-and-a-half years after the incident. (ECF No. 42 at 7 (citing ECF No. 41-1 at 36 (Lucas Dep.)).)

Lucas originally filed this suit in the Circuit Court of Kanawha County, West Virginia, on May 4, 2015, before filing an Amended Complaint ("Complaint") on August 27, 2015. (*See* ECF No. 1-1 at 6, 17.) The Complaint asserts four causes of action: (1) deliberate intent against both Defendants in violation of West Virginia Code § 23-4-2(d)(2)(ii);[3] (2) common law negligence against Arch Coal; (3) "coercion" against the two Defendants; and (4) Plaintiff Barbara Lucas' loss of consortium claim. (*See id.* at 13–16.) Lucas seeks relief in the forms compensatory and

---

[3] The Complaint refers to the statute as W. Va. Code § 23-4-2(d)(ii), but the Court notes that this is an incorrect styling of the statute's subsection. Because this is a deliberate intent claim, the Court assumes that the cause of action arises under W. Va. Code § 23-4-2(d)(2)(ii).

punitive damages[4] under West Virginia law in addition to attorneys' fees and costs. (*Id.* at 16.)

Defendants removed the case to this Court on September 29, 2015, asserting diversity jurisdiction as the basis of removal pursuant to 28 U.S.C. § 1332. (ECF No. 1 at 2–4.) The pending summary judgment motion was filed on October 17, 2017. (ECF No. 41.) Plaintiffs filed no response. As such, the motion is ripe for adjudication.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When evaluating such factual issues, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving

---

[4] The Court notes as a preliminary matter that punitive damages are not available on a deliberate intent cause of action such as that asserted in Count I of the Complaint. *See* W. Va. Code § 23-4-2(d)(2)(iii)(A), *quoted in Marcus v. Holley*, 618 S.E.2d 517, 528–29 (W. Va. 2005).

4

party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323. Courts do not automatically grant motions for summary judgment when they are unopposed. *See* Fed. R. Civ. P. 56(e). The court "must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (quoting *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)).

### III. DISCUSSION

*A. Count I: Deliberate Intention*

Lucas first alleges that Defendants violated West Virginia Code § 23-4-2(d)(2)(ii) by deliberately intending for Lucas to be injured. Generally, employees who are injured at their place of work must seek compensation through the West Virginia Workers' Compensation Act. *See* W. Va. Code § 23-2-6 (2003); *State ex rel. Frazier v. Hrko*, 510 S.E.2d 486, 493 n.11 (W. Va. 1998). This legislation serves the dual purposes of allowing an employee to recover even when he is at fault while immunizing employers from civil litigation. "There is an exception to this immunity, however, when the employee's injury is the result of the employer's 'deliberate intention' to cause that injury." *Helmick v. Potomac Edison Co.*, 406 S.E.2d 700, 705 (W. Va. 1991). The standard for "deliberate intention" as codified by West Virginia law at the time of Lucas' alleged injury provides, in pertinent part, the following:

> (2) The immunity from suit provided under this section and under section six-a, article two of this chapter may be lost only if the employer or person against whom

liability is asserted acted with "deliberate intention". This requirement may be satisfied only if:

. . .

> (ii) The trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that all of the following facts are proven:
>
>> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>>
>> (B) That the employer had a subjective realization and an appreciation of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;
>>
>> (C) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;
>>
>> (D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless thereafter exposed an employee to the specific unsafe working condition intentionally; and
>>
>> (E) That the employee exposed suffered serious injury or death as a direct and proximate result of the specific unsafe working condition.

W. Va. Code § 23-4-2(D)(2)(ii) (2003).

Success on this claim hinges on the existence of evidence proving all five specific requirements enumerated above in subsections (A) through (E). *See Keesee v. Gen. Refuse Serv., Inc.*, 604 S.E.2d 449, 459 (W. Va. 2004) (citing Syl. pt. 2, *Mayles v. Shoney's, Inc.*, 405 S.E.2d 15

(W. Va. 1990)).[5] These elements will not be met where there is no evidence that (1) the machine violated any safety standard, (2) the defective condition was obvious, or (3) a past injury arose from it. *See Kane v. Corning Glass Works*, 331 S.E.2d 807, 809 (W. Va. 1984); *see also Smith v. ACF Indus., Inc.*, 687 F.2d 40, 43 (4th Cir. 1982); *Nedley v. Consolidation Coal Co.*, 578 F. Supp. 1528, 1532–33 (N.D. W. Va. 1984). Importantly, the statute "does not abrogate immunity for employers who engage in objectively hazardous enterprises such as coal mining or chemical production." *Handley v. Union Carbide Corp.*, 620 F. Supp. 428, 436 (S.D. W. Va. 1985), *aff'd*, 804 F.2d 265 (4th Cir. 1986).

Subparagraph (A) "requires proof by the employee of a specific unsafe working condition which presented a high degree of risk and a strong probability of serious injury or death." *McComas v. ACF Indus.*, 750 S.E.2d 235, 240 (W. Va. 2013). The Complaint continuously references "specific unsafe working conditions" in Count I as supporting a claim of deliberate intention. (*See* ECF No. 1-1 at 13–14 ¶¶ 39–41.) The Complaint is no more specific and does not pinpoint a single condition as required by the statute. *See* W. Va. Code § 23-4-2(D)(2)(ii)(A). Parsing through the facts alleged in the Complaint, Lucas identifies the failure of the hoist car's brake as the cause of the injury. (*See* ECF No. 1-1 at 8–9 ¶¶ 15–16, 18.) For purposes of subparagraph (A), the Court will construe as the alleged specific unsafe working condition the manner in which the hoist car's brake was maintained.

Douglas Hager, a hoist operator who was working the day of Lucas' injury, stated in his deposition that the hoist's controls had not changed since he began working at ICG Beckley.

---

[5] *See also Master Mech. Insulation, Inc. v. Simmons*, 753 S.E.2d 79, 86 (W. Va. 2013); Syl. pt. 5, *Deskins v. S.W. Jack Drilling Co.*, 600 S.E.2d 237 (W. Va. 2004) (quoting Syl. pt. 3, *Blevins v. Beckley Magnetite, Inc.*, 408 S.E.2d 385 (1991)).

(ECF No. 41-1 at 7.) In fact, Mr. Hager said that he inspects the hoist before every shift and that he completed "a normal inspection at the beginning of the shift" on the day of the accident. (*Id.* at 8, 12.) James Griswold, a fire boss who was rock dusting with Lucas on May 5, 2013, corroborated the fact that the hoist, including its braking system, was "inspected every day . . . before use." (*Id.* at 23.) While there seems to be some dispute within the depositions regarding the events immediately preceding Lucas' injury, such as whether the hoist car actually fell down the slope, (*compare id.* at 30 (Griswold Dep.), *with id.* at 45 (Lucas Dep.)), this is irrelevant in determining if there was a specific unsafe working condition. Steve Toler, safety manager for ICG Beckley, further provided, contrary to the Complaint's suggestion, that "[t]he hoist [and] the braking mechanisms were working like they should have been working" the day of the accident. (*Id.* at 63 ("I don't believe it was a hazard. . . . [T]here was nothing wrong with the hoist or with the braking mechanism on the car. . . . [T]he braking system was working like it should have been working.").)

When questioned about the unsafe working condition that resulted in his injury, Lucas could not identify such a condition in his deposition. (*See id.* at 45 ("Q. So what made it -- what made it fall? A. To this day, I have no idea. . . . [ICG Beckley] had some issues with [the hoist car]. I don't know what all the issues were, but it's broke[n] before. The rope has broke[n] before. Q. Did the rope break this time? A. No.").) Lucas appears to believe that the accident was caused by the hoist car's braking system but suggests that it also could have been the result of an error by the machine's operator. (*See id.* at 47 ("I don't know if the operator did something or if the brake failed. I don't know.").) Lucas admitted to having no information to suggest that an inadequate examination of the hoist car was performed or that the brakes were not functioning

properly. (*Id.* at 48 ("Yeah, I'm not sure. That's what I'm saying. I'm not a mechanic. I'm not an electrician or whatever. I'm not sure.").) While Lucas may not be a mechanic or electrician, he has not provided any such expert to enlighten the Court as to what possible unsafe working condition might have caused the accident. If maintenance of the braking system or the hoist's brake itself is Lucas' alleged unsafe working condition, Mr. Toler testified that he spoke with James Eastridge, ICG Beckley's maintenance manager, in preparation for his deposition, stating that Mr. Eastridge told him "there were no issues before or after the accident with the brake car" and that no changes or repairs were made in response to Lucas' injury. (*Id.* at 71.) Therefore, the Court finds that Lucas has not proven a specific unsafe working condition, let alone one posing a high degree of risk with a strong probability of serious injury or death. Even viewing the facts in a light most favorable to Lucas, he fails to satisfy subparagraph (A) of the statute.

Proving the employer's "subjective realization and appreciation" of the existence of a specific unsafe working condition, as required by subparagraph (B), "requires an interpretation of the employer's state of mind, and must ordinarily be shown by circumstantial evidence . . . ." *Nutter v. Owens-Illinois, Inc.*, 550 S.E.2d 398, 403 (W. Va. 2001). The statute does not mandate evidence of "prior similar incidents or complaints," *see id.*, but proof that an employer knew of another employee's previous injury from the same unsafe condition does not necessarily establish this requirement. *See McBee v. U.S. Silica Co.*, 517 S.E.2d 308, 312 (W. Va. 1999). In addition, evidence that "the employer reasonably should have known of the specific unsafe working condition and of the strong probability of serious injury or death presented by that condition" is not enough. *See Deskins v. S.W. Jack Drilling Co.*, 600 S.E.2d 237, 242 (W. Va. 2004) (quoting Syl. pt. 3, *Blevins*, 408 S.E.2d at 385). "Instead, it must be shown that the employer actually

9

possessed such knowledge." *Id.*

After Mr. Hager acknowledged in his deposition that an individual was killed previously in an incident that seems to have involved a hoist car and its magnetic braking system, (*see* ECF No. 41-1 at 6–7 (noting that it led to a change in company policy)), he later stated that no issue had ever arisen with regard to the way in which the slope was dusted prior to May 5, 2013. (*Id.* at 18.) Mr. Griswold further testified that he had never seen the hoist malfunction or anybody suffer an injury from it prior to Lucas. (*Id.* at 24 ("Q. Was there ever -- when you were on that machine or on the hoist, did you ever experience it to slip or fall or be jerky or any problems? A. No. Q. Ever see anybody injured on it prior to Mr. Lucas? A. No.").) Mr. Toler, ICG Beckley's safety manager, further stated that he was unaware "of any violations or notices of violations with respect to the operation of the slope hoist itself."[6] (*Id.* at 64.) Notably, Lucas himself testified that to the best of his knowledge neither he nor any of his coworkers made "any complaints about any issues" during his employment with ICG Beckley. (*See id.* at 40.) Lucas also stated that he was unsure whether ICG Beckley had any reason to know that the hoist car or its braking system might malfunction on the day of his injury.[7] (*See id.* at 45–46; *see also id.* at 47 (Lucas Dep.)

---

[6] The Court notes that this evidence also speaks to the third element in support of a conclusion that ICG Beckley was not in violation of any state or federal statute, rule, or regulation regarding mining safety or rock dusting.

[7] The strongest evidence that Lucas cannot provide any evidence of ICG Beckley's subjective realization and appreciation of the existence of an unsafe working condition in the hoist car, its braking system, or in its operation is exhibited in the following passage from Lucas' deposition:

Q. Do you have reason to think that ICG Beckley knew it was going to fall, if it did?

A. I'm not sure.

Q. So you're not sure if they had reason to know?

A. No.

. . .

("Q. And if there -- we've talked about this before, but if there was a problem with the brakes, you don't have any reason to think that ICG Beckley knew about that. Correct? A. I'm not sure if they did, if they ignored it or -- I mean, I don't know.").)

While Lucas' amended answer to Defendants' twentieth interrogatory failed to set forth allegations regarding a specific unsafe working condition, it claimed that "[d]iscovery will provide additional information" on that question. (*Id.* at 54.) However, Lucas has never followed up on that assertion with subsequent information or evidence. It is quite clear that, as in *Blevins*, there are no facts here indicating that Lucas or any other employee brought to ICG Beckley's attention any information regarding a deficient condition in the hoist car's brake that would have put the employer on notice of the alleged unsafe working condition. *See* 408 S.E.2d at 392. There is no evidence before the Court indicating that ICG Beckley should have reasonably known of some specific unsafe working condition, much less evidence suggesting that ICG Beckley had subjective realization and an appreciation of that condition. As Defendants appropriately noted in their memorandum of law, they cannot be held to have knowledge of something that did not exist. (*See*

---

Q. Okay. But you wouldn't have any -- you wouldn't have any evidence to suggest that ICG knew there was a problem with the brakes, if there was?

A. Right. I have no idea.

Q. And you wouldn't have any evidence to suggest ICG knew there would be a problem with the guy you've called Dougie operating the hoist?

A. Not that I know of.

Q. On any of the occasions, you know, in the five to ten times that you've done this before the day in question, had you ever -- had you ever gone to management and said, "Hey, I don't think this is a good idea" or, "I don't like the way we're doing this," anything like that?

A. If I did, I don't recall.

(ECF No. 41-1 at 45–46.)

ECF No. 42 at 13.) Accordingly, even viewing the facts in a light most favorable to Lucas, he also has failed to meet his burden in proving subparagraph (B).

Without evidence that the employer violated any state or federal safety statute, rule, or regulation or well-known industry standard, subparagraph (C) of the statute similarly will not be satisfied. *See Handley*, 620 F. Supp. at 438–39, 442–43. A showing that the employer violated statutes or regulations generally requiring safe workplaces is insufficient to establish this element. *See Tolley v. ACF Indus., Inc.*, 575 S.E.2d 158, 167 (W. Va. 2002). Rather, "the statute or standard must *specifically* address the unsafe working condition in question." *Greene v. Carolina Freight Carriers*, 663 F. Supp. 112, 115 (S.D. W. Va. 1987) (emphasis in original).

The Complaint alleged that Defendants violated 30 C.F.R. § 75.1400[8] and W. Va. Code R. § 56-2-14.1(b)[9] for failing "to perform an adequate daily examination of the hoist car" and to

---

[8] While Lucas does not direct the Court to a specific subsection of this federal regulation related generally to hoisting equipment, the regulation's text provides the following in full:

> (a) Every hoist used to transport persons shall be equipped with overspeed, overwind, and automatic stop controls.
>
> (b) Every hoist handling a platform, cage, or other device used to transport persons shall be equipped with brakes capable of stopping the fully loaded platform, cage, or other device.
>
> (c) Cages, platforms, or other devices used to transport persons in shafts and slopes shall be equipped with safety catches or other no less effective devices approved by the Secretary that act quickly and effectively in an emergency. Such catches or devices shall be tested at least once every two months.
>
> (d) Hoisting equipment, including automatic elevators, used to transport persons shall be examined daily.
>
> (e) Where persons are transported into or out of a mine by a hoist, a qualified hoisting engineer shall be on duty while any person is underground. No such engineer, however, shall be required for automatically operated cages, platforms, or elevators.

30 C.F.R. § 75.1400 (2014).

[9] "The employer shall assure that each machine including any machine provided by an employee is inspected before initial use during each work shift. Defects or damage shall be repaired on the unserviceable machine or shall be replaced before work is commenced." W. Va. Code R. § 56-2-14.1(b) (West 2017).

"supply [Lucas] with a hoist car with properly functioning brakes in order to perform his assigned duties . . . ." (ECF No. 1-1 at 12 ¶ 38(b)–(c).) Further, the Complaint alleges violations of 30 C.F.R. § 50.20(a)[10] and W. Va. Code R. § 36-19-4.3[11] for failing "to report the accident and occupational injury to state and federal authorities . . . ." (*Id.* ¶ 38(d).)

Mr. Toler stated in his deposition that an internal accident report was prepared after the injury but that the Mine Safety and Health Administration ("MSHA") was not advised of the injury because "it was not life-threatening. It didn't meet one of the requirements of making a report." (ECF No. 41-1 at 69.) *See also* 30 C.F.R. § 50.20–5 (providing types of accidents that are reportable to MSHA, including "injury to an individual at a mine which has a reasonable potential to cause death"). Because the injury did not meet one of the codes enumerated in § 50.20–5 of Title 30 of the Code of Federal Regulations, it was not a reportable injury via Form 7000–1 and not a violation of § 50.20(a). This conclusion may be extended to find that the equivalent state statute regulation, requiring the report of an "injury with a reasonable potential to cause death," similarly was not violated. *See* W. Va. Code R. § 36-19-4.3.

As Mr. Toler, Mr. Hager, and Mr. Griswold all testified, the hoist car and braking system

---

[10] This federal regulation provides, in pertinent part, that operators "shall report each accident, occupational injury, or occupational illness at the mine" via the appropriate Mine Safety and Health Administration form within ten working days after the accident or injury. 30 C.F.R. § 50.20(a) (2006).

[11] The state regulation closely resembles its federal equivalent and provides as follows:

> Whenever any accident or occupational injury occurs in or about any coal mine to any employee or person connected with the mining operation, which does not result in death or injury with a reasonable potential to cause death, the operator, agent, mine superintendent or mine foreman shall, within ten (10) working days, report the same in writing to the director of the Office of Miners' Health, Safety and Training and upon request, to the miner representative within twenty-four (24) hours of submittal, giving full details thereof on forms provided by the department. If the operator is not made immediately aware of the injury, the written accident/injury report shall be submitted within ten (10) working days of the date the operator was notified.

W. Va. Code R. § 36-19-4.3 (1996).

were regularly inspected, including on May 5, 2013. (*See* ECF No. 41-1 at 8, 12, 23, 71.) No evidence contradicts the statements of these individuals except, perhaps, Lucas' bare and speculative suggestions that the hoist car must not have been inspected properly because it or its braking system allegedly malfunctioned on the day of the accident. (*See id.* at 47–48.) Lucas' amended answer to Defendants' nineteenth interrogatory suggests that his exposure "to an unsafe, deadly and dangerous working condition is a violation of general safety and industry standards." (*Id.* at 53.) However, there is no evidence supporting the allegation that Lucas actually was exposed to an "unsafe, deadly and dangerous working condition" as he failed to prove the existence of a specific unsafe working condition. Thus, the Court disagrees that there are facts sufficient to find "a violation of general safety and industry standards." (*See id.*) Accordingly, the facts do not support a finding that Defendants were in violation of any statute, rule or regulation or any commonly accepted industry standard as required by subparagraph (C).

The Court need not reach the fourth and fifth elements in subparagraphs (D) and (E) of the deliberate intention analysis as Lucas has not made an adequate showing on any of the first three. Consequently, it is irrelevant whether ICG Beckley exposed Lucas to an inadequately maintained hoist car brake because he has not shown that such a condition actually existed. *See Mumaw v. U.S. Silica Co.*, 511 S.E.2d 117, 124 (W. Va. 1998). Likewise, it is immaterial whether Lucas suffered serious injury as a direct and proximate cause of the brake's failure because he has not shown that such injury resulted from an unsafe working condition. The Court reiterates that the question before it is not one of injury during the course of employment. Rather, the question is one of deliberate intent. On that question, Lucas has failed gravely to make an adequate showing of Defendants' deliberate intention to cause his injury. Therefore, Defendants are entitled to

judgment as a matter of law on Count I.

B.  *Count II: Negligence*

Plaintiffs allege a negligence cause of action against Arch Coal "alternatively, to the extent that it is not the employer of [Lucas]." (ECF No. 1-1 at 14 ¶ 44.) It appears to be Lucas' position that Arch Coal, "as owner of the premises and/or having control over the premises," negligently maintained a safe place for him to work. (*Id.* ¶¶ 45–48.) Lucas alleges that Arch Coal's breach directly and proximately caused his injury. (*Id.* ¶ 49.) Arch Coal argues in its motion, first, that there is no evidence of a breach of "any duty to provide [Lucas] with an unsafe [sic: safe] workplace" or of the cause of Lucas' injury, and, second, that because Lucas has alleged that Arch Coal employed him, workers' compensation was the only remedy Lucas could pursue. (*See* ECF No. 42 at 19 (citing ECF No. 1-1 at 14 ¶ 45).)

As a preliminary matter, the Court does not agree with Defendants' characterization of the claim in Count II as alleging "that Arch Coal was [Lucas'] employer." (*Id.*) The Complaint asserts Count II against Arch Coal, "alternatively, to the extent that it is *not* the employer of [Lucas]." (*Id.* ¶ 44 (emphasis added).) If the Complaint brought Count II against Arch Coal as Lucas' employer, as it did with Count I, the Court would have little trouble agreeing with Defendants that Lucas' only remedy against Arch Coal would be workers' compensation.[12]

---

[12] An employer that subscribes to and pays premiums into the Workers' Compensation Fund and otherwise complies with the Workers' Compensation Act is entitled to immunity for an employee's injury and cannot be held liable at common law. *See* W. Va. Code § 23-2-6 (2003). That state statute "is also known as the 'exclusivity' provision, as it makes workers' compensation benefits the exclusive remedy for personal injuries sustained by an employee injured in the course of and resulting from his or her covered employment." *State ex rel. Frazier v. Hrko*, 510 S.E.2d 486, 493 n.11 (W. Va. 1998). The immunity is not easily forfeited and may only be lost in one of two ways: "(1) by defaulting in payments required by the Act or otherwise failing to comply with the provisions of the Act, or (2) by deliberately intending to produce injury or death to the employee." *Smith v. Monsanto Co.*, 822 F. Supp. 327, 330 (S.D. W. Va. 1992); *see also Erie Ins. Prop. & Cas. Co. v. Stage Show Pizza, JTS, Inc.*, 553 S.E.2d 257, 265 (W. Va. 2001) (finding that an employer was not immune under W. Va. Code § 23-2-6 from a common law negligence suit and could not assert certain common law defenses in § 23-2-8 because of the employer's default on its workers'

However, this is not the legal theory underpinning the second cause of action as Lucas pleads it in the alternative. Nonetheless, the evidence before the Court does not support a finding of negligence against Arch Coal.

To survive summary judgment, a plaintiff must put forward evidence of the following elements of a negligence claim: 1) that the defendant owed him a duty of care; 2) that the duty was breached by some act or omission; and 3) that the act or omission proximately caused 4) some injury to the plaintiff that is compensable by damages. *Hersh v. E-T Enters., Ltd. P'ship*, 752 S.E.2d 336, 341 (W. Va. 2013); *see also McNeilly v. Greenbrier Hotel Corp.*, 16 F. Supp. 3d 733, 738 (S.D. W. Va. 2014). "The owner or occupier of premises owes to an invitee such as a non-employee workman or an independent contractor the duty of providing him with a reasonably safe place in which to work and has the further duty to exercise ordinary care for the safety of such persons."[13] Syl. pt. 6, *Kerns v. Slider Augering & Welding, Inc.*, 505 S.E.2d 611 (W. Va. 1997) (quoting Syl. pt. 2, *Sanders v. Georgia-Pacific Corp.*, 225 S.E.2d 218 (W. Va. 1976)). Assuming that Arch Coal was not Lucas' employer but simply the owner of the premises, the Supreme Court of Appeals of West Virginia has "generally recognized that the owner who provides a reasonably

---

compensation obligations).
The Court already concluded above that Lucas failed to prove the latter of those two scenarios. Thus, to make a finding that Arch Coal is liable at common law for Lucas' injury while he was on the job for Arch Coal's subsidiary ICG Beckley, Lucas would have to show that Arch Coal defaulted in its workers' compensation payments or otherwise failed to comply with the Act. *See State ex rel. Abraham Lincoln Corp. v. Bedell*, 602 S.E.2d 542, 547–48 (W. Va. 2004). Because there is no allegation or evidence that Arch Coal defaulted on payments or failed to comply with the law, Arch Coal would be immune for common law suits such as those brought pursuant to a theory of negligence. Again, this analysis would only apply if Arch Coal were found to be Lucas' employer, *cf. Williams ex rel. Estate of Williams v. Werner Enters., Inc.*, No. 12–0847, 2013 WL 3184845, at *1–3 (W. Va. June 24, 2013) (unpublished opinion) (finding that the parent company of the decedents' direct employer "exercised control over the decedents' work and held itself out as the employer," and holding that the company was "a joint employer and therefore entitled to workers' compensation immunity"), which the Court refrains from doing in this analysis as it is unnecessary to resolve Lucas' negligence claim.

[13] The Court assumes for the purpose of this analysis that Lucas was not an employee of Arch Coal because if he were, as explained previously, Arch Coal would be immune from a negligence cause of action.

safe place to work cannot be held liable unless the owner continues to exercise control over the workplace." *Id.* at 618. The Complaint alleges that Arch Coal had authority and control over ICG Beckley to assure that the workplace was safe for employees, but the only evidence supporting this allegation is Mr. Toler's statement that although the mine operated under ICG Beckley, he "maybe followed a little" certain safety guidelines from Arch Coal as well. (ECF No. 41-1 at 61.)

Even if Arch Coal had authority and control over ICG Beckley and its employees, despite little to no evidence of this fact, Defendants have shown that there is no genuine issue of fact regarding any breach of Arch Coal's duty to provide Lucas with a safe working environment. The evidence indicates, as detailed above with regard to Count I, that there was no unsafe working condition at the Beckley Pocahontas Mine. *See* discussion *supra* Section III.A. By extension, Defendants have proven through the various depositions that there is no material dispute as to the existence of a safe workplace. If anything, the alleged injury was caused by a freak accident that does not act to impose liability upon the owner of the premises. (*See* ECF No. 41-1 at 45, 47–48 (Lucas Dep.) (acknowledging that he does not know whether the accident was caused by machinery malfunction, operator error, or possibly a combination of the two); *see also* ECF No. 41-1 at 71 (Toler Dep.).) After Defendants make that showing, the burden shifts to Lucas to establish the existence of a breach, *see Catrett*, 477 U.S. at 322, and he fails to meet that burden in light of the evidence and, particularly, given his lack of response to the motion. The Court reiterates that no evidence has been provided by an expert to shed light on what caused the accident or whether Lucas' alleged injuries proximately flowed from the May 5, 2013, accident. Without evidence to the contrary, the Court finds that Lucas has failed to make out a prima facie case of negligence and that Defendants are entitled to judgment as a matter of law on Count II.

### C. Count III: Coercion

Plaintiffs allege a "coercion" claim against Defendants based on their employee's alleged act of threatening Lucas and his co-workers with termination if they did not sign a document indicating that they were at fault for the accident. (ECF No. 1-1 at 11 ¶ 32, 15 ¶¶ 53–55.) Defendants state in their motion that coercion is not a cause of action in this State, and Plaintiffs failed to respond or guide the Court toward any legal authority in support of this claim. The Court agrees with Defendants as an independent survey of the applicable West Virginia authority indicates that no civil cause of action exists for coercion. Accordingly, Defendants are entitled to judgment as a matter of law on Count III.

### D. Count IV: Loss of Consortium

"[T]he derivative claim for loss of consortium is a mere incident to a cause of action and not the subject of an action itself." *Raab v. Smith & Nephew, Inc.*, 150 F. Supp. 3d 671, 702 (S.D. W. Va. 2015) (quoting *State ex rel. Small v. Clawges*, 745 S.E.2d 192, 201 (W. Va. 2013) (internal citation omitted)). This cause of action only "survives alongside those claims on which it depends." *Williams v. Smith & Nephew, Inc.*, 123 F. Supp. 3d 733, 749 (D. Md. 2015). Because Plaintiffs failed to prevail on Counts I through III, Count IV cannot survive independently. *Cf. McLaurin v. Vulcan Threaded Prods., Inc.*, 410 F. App'x 630, 633 n.3 (4th Cir. 2011) (unpublished opinion). Therefore, Defendants are entitled to judgment as a matter of law on Count IV.

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, (ECF No. 41), is **GRANTED**. Accordingly, this case is **DISMISSED** and retired from the docket of this Court.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: February 23, 2018

_____
THOMAS E. JOHNSTON, CHIEF JUDGE